

666 OLD COUNTRY ROAD, SUITE 700
GARDEN CITY, NEW YORK 11530
516.745.1500 • [F] 516.745.1245
WWW.BARKETEPSTEIN.COM

ADDITIONAL OFFICES:
EMPIRE STATE BUILDING, NY, NEW YORK
HUNTINGTON, NEW YORK
ALL MAIL TO GARDEN CITY ADDRESS

June 22, 2026

**_Via ECF_**
Hon. Philip M. Halpern U.S.D.J.
Southern District of New York
300 Quarropas Street, Chambers 520
White Plains, New York 10601-4150

Re: ***Bowden v. Caswell, et al.*, 25-cv. 9301 (PMH)**

Dear Judge Halpern,

This office represents the Plaintiffs in this matter, who were victimized in a large-scale assault and lockdown that took place at Sing Sing Correctional Facility in November of 2022. We are writing in response to Defendant Decker's pre-motion letter concerning severance, and to explain why such a motion would ring hollow on the merits, and would likewise, if granted, result in an extraordinary waste of judicial resources. This case concerns one days-long campaign of attacks, at one facility, during one lockdown, during one span of time. And yet, the Defendant's motion for "severance" would seek to fracture the case into twenty-five highly repetitive pieces—requiring many of the same witnesses and the same evidence to be presented dozens of times. It is our hope that after considering the lack of merit that would attend such a severance-application, the defense will agree – before spending weeks or months on motion practice – that a motion for severance would be unfounded, and should not be filed.

## Factual Background

Between November 7 and November 10, 2022, prison guards inside Sing Sing Correctional Facility initiated a massive and days-long campaign of violence and harassment against defenseless incarcerated men inside their prison cells. The violence administered against the prisoners followed a general pattern, pursuant to which multiple guards would enter each cell; the incarcerated men would be directed to place their hands up against the back walls of their cells or to interlace their hands behind their heads—and in almost all cases would be ordered to strip down to their underwear and slippers; and then, after complying, and without provocation, the prisoner would suffer a violent battery requiring medical attention. This behavior, led by members of the Correctional Emergency Response Team (or "CERT"),[1] was so widespread and organized that it prompted more than two dozen victims to step forward—all of whom had similar experiences, suffered within the same timeframe, within the same facility, and whose experiences on information and belief form the basis of an ongoing federal criminal investigation.

In response to the victims' federal action, the defense seeks to initiate a war of attrition—breaking the Plaintiffs' cases apart into standalone lawsuits, even though their experiences all arise from the same incident, at the same facility. If granted, this relief would require certain witnesses (the Superintendent, for example) to testify dozens of times, would risk inconsistent adjudications of case-issues or outcomes, and would ignore the overarching reality of this case—which is that this happened not because of the individualized conduct, here and there, by a prisoner or correctional officer, but because of a decision by State agents to engage in concerted conduct made on a system-wide level. A motion seeking this relief would lack merit and should be denied.

---

[1] CERT members are specially trained correction officers who are assembled and deployed by top-ranking Department of Corrections and Community Supervision ("DOCCS") officials to neutralize threats posed by inmates. *See Matthews v. DOCCS*, 2023 WL 2664418 *2, fn 3 (N.D.N.Y. 2023).

**Discussion**

Rule 20(a) of the Federal Rules of Civil Procedure permits joinder of multiple defendants in one action if (1) "any right to relief is asserted against them jointly, severally, or in the alternative arising out of the same transaction, occurrence, or series of transactions and occurrences," and (2) "any question of law or fact common to all defendants will arise in the action." *See* Fed. R. Civ. P. 20(a). "In assessing whether the requirements of Rule 20 are met, courts must accept the factual allegations in a plaintiff's complaint as true." *Gibson v. Rosati*, 2014 WL 3809162, at *10 (N.D.N.Y. 2014).

The question of what constitutes the same "transaction" or "occurrence" – Rule 20(a)'s first requirement – is approached on a case-by-case basis *(see Dixon v. Scott Fetzer*, 317 F.R.D. 329, 331 [D. Conn. 2016]), and the answer depends on the logical relationship between the claims and whether the "essential facts" of the claims "are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).

The second requirement—that a question of law or fact common to all defendants will arise in the action—is met where "the court finds that there is 'substantial' overlap in questions of law or fact across the claims." *Ardolf v. Weber*, 332 F.R.D. 467 (S.D.N.Y. 2019). The present case easily meets these requirements.

*First*, the case involves a concerted effort by the Defendants in one lockdown at Sing Sing – in a pre-planned, coordinated effort – to assault Plaintiffs and other incarcerated men in their cells during this days-long event. Indeed, as set forth in Plaintiff's complaint (*see* ECF Doc. 1, ¶108) the Lockdown and Overall Facility Search of the kind that gave rise to Plaintiffs' claims can only take place pursuant to a directive from a high-ranking official within New York State. *See*

DOCCS Directive 4910(VI)(C)(2). *See also McLeod v. Scully*, 1984 WL 692 *1 (S.D.N.Y. 1984) (stating a "lockdown is undoubtedly one of the most extreme and disruptive measures a prison can impose" – and requires coordination by the highest-ranking officials).[2] By DOCCS' own regulations, in other words, what happened here was *not* a series of isolated incidents involving correctional officers confronting varying circumstances throughout the prison. Rather, by definition, it was initiated by the coordinated and deliberate efforts of Sing Sing's (and DOCCS') highest-level members. Defendants wore no name tags, were all outfitted in the same type of riot gear, rendering their collective accountability even more apparent, and were unequivocally unified in purpose. In short, Plaintiffs' claims against the Defendants are all logically connected.

*Second*, a common question of fact exists: whether some normal and collective practice of excessive force in fact pervaded the acts committed by the Defendants during the Lockdown and Overall Facility Search.[3] *See Gibson v. Rosati*, 2014 WL 3809162 at *11, citing *Streeter v. Joint Indus. Bd. of Electrical Indus.*, 767 F. Supp. 520, 529 (S.D.N.Y. 1991) ("[a] question of whether multiple defendants constitute some sort of joint enterprise to cause harm to a plaintiff is a common question sufficient to satisfy Rule 20(b)" (*id.*). Indeed, each Plaintiff alleges an unconstitutional use of force against members of the same team of Defendants, who acted in concert, with a unity of purpose, in subjecting each Plaintiff a similar form of cruel and unusual punishment.

---

[2] More particularly, the facility Superintendent must consult with the Deputy Commissioner for Correctional Facilities, and then, after consultation, the Superintendent can electronically submit a request for an "overall facility search" to the Deputy Commissioner for Correctional Facilities. The basis for such an extraordinary measure must be "clearly delineated by the Superintendent," and upon approval, the Superintendent must also notify the Deputy Commissioner and Chief of the Office of Special Investigations (OSI), and OSI is then required to observe the search.

[3] According to a Prison Violence Task Force Report by DOCCS dated June 2023, DOCCS began deploying Corrections Emergency Response Teams from around the state to conduct Overall Facility Searches and investigators with the Office of Special Investigations (OSI) to observe these searches, beginning in August 2021. In 2022, according to the Report, in addition to the Overall Facility Search at Sing Sing, the Department conducted six other overall facility searches.

*Third*, severance would cause an immense waste of judicial resources. In determining whether to sever a claim, the court considers the two requirements of Rule 20 discussed above, as well as some additional factors, including (1) whether severance will serve judicial economy; (2) whether prejudice to the parties would be caused by severance; and (3) whether the claims involve different witnesses and evidence" (*see Clay v. Doe*, 2020 WL 6151436 at *2 [S.D.N.Y. 2020]).

Here, defense counsel argues that severance is required to prevent prejudice against Defendant Decker, and that Plaintiffs' claims, in any event, will involve vastly different evidence. Neither concern withstands scrutiny. First, any prejudice to Defendant – and concerns about evidentiary "spill-over effect" – can be easily alleviated by this Court's careful instructions to the jury. Further, contrary to Defendant's suggestion, there is widespread overlap in the evidence pertinent to each of the Plaintiffs' cases. Because each incident underlying this action springs from the same lockdown, at the same facility, prompted by the same high-level State officials, many of the same documents and witness accounts are germane to all of the claims.[4] In attempting to break the case into more than two dozen individual pieces, then, severance would dramatically increase the costs of litigation—requiring dozens of different sets of discovery demands and responses instead of one; requiring at least some witnesses to testify dozens of times, including potential experts whose costs would thus explode; and risking inconsistent outcomes on a variety of subject matters, including motions on virtually identical discovery or evidentiary issues, or verdicts on virtually identical cases.

---

[4] All relevant uses of force in this case were logged under the same Unusual Incident Report; each claim will require the Defendants to produce the same CERT deployment and deactivation memorandum and CERT Operations and Training Manual; and each Plaintiff will seek to depose the Superintendent, the head of OSI and its lead assigned investigators, and the medical staff working during the Lockdown – just to name a few.

For these reasons, we respectfully request that the Defendant's request for a pre-motion conference to pursue severance be denied.

Respectfully,

/s/ DMM

Danielle Muscatello, Esq.
Alexander Klein, Esq.